**Carolyn JAMES, as Personal Representative of the Estate of William James, Plaintiff,**

v.

**CITY OF CHESTER; City of Chester Police Department; Lawrence Strait, Chief of Police, in his individual and official capacity; Aaron Madden, in his individual and official capacity, Defendants.**

Civ. A. No. 3:92–812–17.

United States District Court,
D. South Carolina,
Columbia Division.

May 18, 1994.

Sharon McCain Rickborn, Columbia, SC, A. Philip Baity, Fort Mill, SC, for plaintiff.

William Henry Davidson, II, Ellis, Lawhorne, Davidson, Sims, Morrison & Sojourner, P.A., Columbia, SC, Terry B. Millar, McKinney, Givens & Millar, P.A., Rock Hill, South Carolina, for defendants.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

On April 29, 1989, the plaintiff, Carolyn James, and her husband of one year, William M. James, began celebrating their anniversary at their apartment on Saluda Street in Chester, South Carolina. Unfortunately, the celebration turned ugly, as Mr. James struck his wife in the face, prompting her on two occasions to call the police seeking protection. After the second call, an officer arranged for Mrs. James to swear out a warrant against her husband for simple assault and battery. When two officers returned to the James residence to serve the warrant upon Mr. James, he confronted them in the apartment, prompting one of the defendants, Aaron Madden, to fire one round from his police revolver. The bullet struck and mortally wounded Mr. James.

The battered spouse who sought police intervention, Carolyn James, was then appointed as the executrix of her husband's estate and initiated this action against Madden, Chester Chief of Police Lawrence Strait, the Police Department itself, and the City of Chester. In her complaint, the plaintiff asserts a cause of action under 42 U.S.C. § 1983 against Officer Madden for arresting her husband without probable cause in violation of the Fourteenth Amendment to the United States Constitution and also for using excessive force when serving the arrest warrant. The plaintiff also asserts an equal protection claim. The plaintiff contends that the remaining defendants—the City, the Police Department, and Chief Strait—have engaged in a pattern and practice of failing to train police officers in the use of firearms and in failing to establish adequate policies and procedures regarding the use of deadly force during arrests. The plaintiff also asserts a supplemental state-law claim for negligence and recklessness against all defendants.

This matter is presently before the court upon the motion of all defendants for summary judgment. The court heard oral argument on the motion on December 28, 1993. At the conclusion of the argument, the court took the motion under advisement so that it could read several pertinent depositions in their entirety. The court has now reviewed the full transcripts of these depositions and has reread all of the memoranda and other materials submitted in connection with the summary judgment motion. For the reasons

that follow, the defendants' motion for summary judgment is granted.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Viewed in the light most favorable to the plaintiff, the facts are as follows:

Carolyn James met her husband in Ft. Lauderdale, Florida in 1987 and began living with him late that year. In April 1988, she and Mr. James were married. A baby girl was born to the couple on January 12, 1989. William James quickly proved to be an abusive husband. In a statement given to law enforcement authorities on the night her husband was killed, Mrs. James indicated that, in the 19 months they were together, her husband had assaulted her approximately 20 times by slapping her and choking her. In her deposition, the plaintiff indicated that she may have exaggerated when she stated that the assaults totaled 20, but she conceded that

her husband had been extremely abusive, once sending her to the hospital for a broken nose and a laceration above her eye by striking her in the face with a chair. (James depo., p. 46). In 1988, Mr. and Mrs. James moved to Chester and took up residence in a multi-story apartment complex on Saluda Street. A neighbor in the apartment below them, Cynthia Dianne Humphries, testified at her deposition that she overheard several altercations between the Jameses. According to Mrs. Humphries:

> You could hear him hitting her, and she'd holler and scream. You could hear him banging her up against the walls. That was almost every day, and it would start at night and be way over in the morning. It would wake me and my kids up them fighting so bad.

(Cynthia Humphries depo., p. 12). Mrs. Humphries also testified that "every time I saw [Mrs. James] she was swollen or bruised." Also, Mrs. James testified in her deposition that Mr. James "had swung a baseball bat at me when I was pregnant." (James depo., p. 51).

On April 29, 1989, the plaintiff and her husband began celebrating their wedding anniversary when they awoke around 12 noon. Both of them began drinking beer, and Mr. James smoked marijuana that afternoon. At approximately 5:00 p.m. that day, Mr. James struck the plaintiff in the face, causing her to take refuge in Mrs. Humphries's apartment below. Present in the Humphries apartment when Mrs. James sought shelter there were Cynthia Humphries and her estranged husband, Richard Humphries, who happened to be visiting his wife in her apartment at the time. According to Mrs. Humphries, the plaintiff appeared to have been drinking and was "real shaky and nervous like she was terrified." (Cynthia Humphries depo., p. 14). Mrs. Humphries also noticed that one of the plaintiff's cheeks was swollen and bruised. Mr. Humphries drove the plaintiff to a public telephone, where she called the Chester Police Department. (There was no telephone in the Humphries apartment). Officer Madden was dispatched to the Humphries apartment to meet with the plaintiff. Upon hearing the plaintiff's story, Madden advised the plaintiff

that he could not arrest Mr. James for being drunk in his own apartment, and that if she wished to obtain any type of relief, it would be necessary for her to go before a city judge to swear out a warrant for her husband. Officer Madden then left.

The plaintiff then discussed her options with the Humphries further and, once more, asked them to take her to a public telephone, where, at 8:54 p.m., she again called the Police Department. Officer Madden again responded to the call and met Mr. and Mrs. Humphries, the plaintiff, and the plaintiff's infant child at the convenience store where the plaintiff had made the call. Mrs. James indicated her desire to swear out an arrest warrant on her husband. Mr. Humphries and Mrs. James followed Madden back to the Law Enforcement Center, where the plaintiff went before City Judge Gray Jones and signed an affidavit that her husband had struck her about the face and head in violation of the laws against simple assault and battery. Mrs. James testified in her deposition that she had consumed three beers prior to going before Judge Jones; yet, she also testified that she was so intoxicated that she does not recall anything she said or did in Judge Jones's presence. (James depo., p. 44). In any event, Judge Jones duly issued an arrest warrant, which was given to Madden to serve upon Mr. James.

While Mr. Humphries and the plaintiff were at the Law Enforcement Center, Mr. James walked down the flight of stairs to the porch outside of the Humphries residence and, thinking that his wife was still inside of the Humphries apartment, began screaming and beating upon the Humphries porch with a baseball bat, damaging the porch. (Cynthia Humphries depo., p. 17–19, 37). Mrs. Humphries heard James saying that he intended to kill his wife. (*Id.* at 18). In addition, Mrs. Humphries testified that she knew James possessed a gun in his apartment. (*Id.* at 20).

In due course, Madden, Hollingsworth, Mr. Humphries, and the plaintiff arrived at the apartment complex, where Mrs. James again sought refuge in the Humphries apartment. Madden and Hollingsworth went up the stairs to attempt to serve the warrant upon Mr. James. Both officers wore standard police uniforms.[1] As the officers climbed the stairs, Mrs. Humphries yelled to them to advise them that Mr. James "had a gun." (Cynthia Humphries depo., p. 28). When they found the door to the James apartment locked, the officers walked back down stairs to request Mrs. James to unlock the door for them. Mrs. James complied, but hurried back down the stairs as soon as the door was unlocked. Both officers then entered the apartment and began walking through it looking for Mr. James. Significantly, neither officer was stationed at the door to prevent Mr. James from walking back into his apartment and happening upon the officers while they were inside.

Mr. James, who apparently had gone to a store to obtain more beer, returned to apartment complex and walked up the stairs. Both Mr. and Mrs. Humphries saw James go up the stairs and enter the James apartment. According to Mr. Humphries, James hollered "I'll get you or something" (Richard Humphries depo., p. 25) and appeared to hold something over his head (*id.* at 27). Mrs. Humphries likewise saw something in the air above James's head (Cynthia Humphries depo., p. 25). Mrs. Humphries testified that "James looked like a madman" and that he was "just screaming and acting crazy like he was ready to kill." (*Id.* at 30). Also, she said that James entered his apartment "like a bat out of you know where." (*Id.*). Both Mr. and Mrs. Humphries heard one of the law enforcement officers shout "drop it" several times. (Richard Humphries depo., p. 27) (Cynthia Humphries depo., p. 31). A few seconds later, the Humphries heard the fatal shot.

Madden and Hollingsworth testified that, after announcing themselves as police officers, they entered the door that Mrs. James had unlocked for them and then proceeded through the apartment, room by room, seeking to locate Mr. James to serve the warrant

---

1. The uniforms consisted of a blue shirt, blue pants, name tag, badge, rank insignia, department emblem, service holster, and hat.

upon him. While they were in the apartment, Madden heard a noise and yelled to Hollingsworth that James was coming. Madden then stepped into the living room and was confronted by James, who was standing in the kitchen area and swinging a baseball bat. According to Madden, James yelled "I'll kill you, mother f* * * * *." Madden then instructed James to "drop it," but James refused to drop the bat and continued to approach from the kitchen area into the living room area towards Madden. As James approached the doorway between the kitchen and the living room, Madden drew his gun, whereupon James again yelled "I'll kill you, mother f* * * * *." Madden repeated his command to drop the bat and stepped backward as James approached. According to Madden, when James was approximately three to four feet away and continuing to wave the bat, Madden fired one shot. James fell to the floor and later died from the single gun shot wound.

The toxicology report prepared after his death indicated that James's blood alcohol level was 0.245 percent after being given two blood transfusions. James apparently lost about half of his blood from the gun shot wound, and the two transfusions would have diluted the alcohol in his blood, resulting in a lower reading. According to the pathologist, the two blood transfusions would have lowered the final overall alcohol level significantly. In the room where James was shot, investigators found a paper bag containing a pack of beer. A bullet had pierced one of the beer cans, and the bag was partially stained with blood. Although Madden testified that

he did not see James holding anything when James approached him with the bat, the court must be mindful of its obligation to consider all of the evidence and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. Accordingly, the court must assume that James was, in fact, holding a pack of beer in one hand, thereby somewhat limiting his ability to attack an officer with a baseball bat. Also, investigating officers found that the bat and the bag of beer were not located immediately adjacent to Mr. James's body.

Carolyn James was thereafter appointed as the personal representative of her deceased husband's estate and initiated this action seeking relief under the remedial provisions of 42 U.S.C. § 1983 and supplemental state-law claims. The court will address the federal claims in the order in which they are presented in the complaint.

## I. Claims Against Officer Aaron Madden [2]

### A. False Arrest

■ The plaintiff contends that the officers deprived Mr. James of his liberty without due process of law. Specifically, the plaintiff contends that Officer Madden participated in procuring an arrest warrant for Mr. James based upon less than probable cause. Mrs. James asserts that she was highly intoxicated at the time the arrest warrant was obtained and that she went before the city judge only after "constant badgering" by the Humphries. She contends that because she was so intoxicated, she does not recall anything that transpired before the city judge [3]

2. Defendant Madden's motion for summary judgment attacks all of the plaintiff's claims on their merits. Qualified immunity, though pleaded as a defense in the answer, is not asserted as a basis for granting summary judgment. In the area of excessive force, some courts and scholars suggest that the qualified immunity defense is coextensive with the plaintiff's claim on the merits, because both require the fact finder to focus upon the objective reasonableness of the force used under all of the surrounding circumstances. *See* generally Karen M. Blum, *Qualified Immunity: A User's Manual,* 26 Ind.L.Rev. 187, 220–221 (1993); Kathryn R. Urbonya, *Problemmatic Standards of Reasonableness: Qualified Immunity in Section 1983 Actions for Police Officer's Use of Excessive Force,* 62 Temple L.Rev. 61, 67 (1989). In the Fourth Circuit, however, the qualified

immunity defense has been held to be a viable defense even in the excessive force context. *Slattery v. Rizzo,* 939 F.2d 213 (4th Cir.1991). Because the defendants' motion for summary judgment does not raise the qualified immunity defense, the court will not address it in this opinion.

3. Mrs. James's contention that her intoxication somehow lessened the probable cause to charge her husband with a crime for assaulting her brings to mind Justice Heydenfeldt's famous aphorism: "A drunken man is as much entitled to a safe street, as a sober one, and much more in need of it." *Robinson v. Pioche, Bayerque & Co.,* 5 Cal. 460, 461 (1855). Intoxicated women who are abused by their mates are no less deserving of the law's protection than sober ones.

and that because her husband had already left the apartment, there was no immediate danger to her if she returned. Mrs. James even attempts to minimize the blows she allegedly received from her husband by suggesting that swelling and puffiness of facial features is not uncommon in alcoholics who have been drinking beer most of the day. For all of these reasons, plaintiff contends that, at the time the warrant was issued, there was no reasonably trustworthy information which would warrant a person of reasonable caution to believe that an offense had been or was being committed.

The plaintiff's due process claim fails as a matter of law. An arrest made pursuant to a facially valid warrant does not give rise to a constitutional claim. *Mitchell v. Aluisi,* 872 F.2d 577 (4th Cir.1989). The warrant in this case was obtained by Mrs. James, not Officer Madden. Judge Jones issued the warrant to Mrs. James after receiving her affidavit and observing her in his presence. Judge Jones was thus able to assess Mrs. James's relative state of intoxication and the bruises and swelling on her face. The warrant was thus facially valid, and no section 1983 claim may be asserted under these circumstances.

■ Courts have recognized an exception to the facially valid warrant rule: where the officer himself procures a warrant without independently exercising his professional judgment in having the warrant issued. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098–99, 89 L.Ed.2d 271 (1986) (an officer's application for a warrant that is not objectively reasonable may support a § 1983 claim because it creates the unnecessary danger of an unlawful arrest: "We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment."); *see also Clipper v. Takoma Park, Md.,* 876 F.2d 17 (4th Cir.1989) (probable cause did not exist for arrest of a bank robbery suspect, and police officer's conduct consequently violated the Fourteenth Amendment, where the officer failed to interview alibi witnesses and did not look at bank surveillance films, and other officers expressed doubt as to the suspect's guilt).

Although the plaintiff's memorandum in opposition to the summary judgment motion does not explicitly argue the *Malley/Clipper* line of cases, the thrust of her argument seems to be that Madden participated in an arrest without probable cause. Conceding for the moment that Madden played a part, at least indirectly, in the procurement of the arrest warrant, the court is nevertheless constrained to conclude that the warrant here was supported by an ample showing of probable cause.

Initially, it should be noted that Madden responded not once, but twice, to calls by Mrs. James for assistance. On the occasion of the first meeting, Madden declined her request to enter her apartment and attempt to arrest Mr. James for being drunk, explaining that he could arrest an individual in the individual's own home only after an appropriate warrant had been procured. He explained to Mrs. James the procedure for obtaining such a warrant and then returned to the station. Thereafter, he was again summoned by Mrs. James, who then requested that he assist her in locating the Law Enforcement Center so that she, herself, could obtain the warrant.

Secondly, the record belies many of the assertions Mrs. James makes regarding the probable cause issue. Specifically, contrary to the assertions in her brief, the plaintiff testified in her deposition that she had consumed only "two or three beers prior to going before the judge." (Carolyn James depo., pp. 66, 68, and 71). The plaintiff also argues that it was not necessary for her husband to be arrested, inasmuch as she could have easily spent the night in her own apartment or, alternatively, could have remained with the Humphries until her husband calmed down. However, the Humphries testified that they would not have allowed the plaintiff to stay with them for fear of their own safety. In addition, the plaintiff's reluctance to enter her own apartment by herself was pointedly demonstrated when she alighted the stairs after unlocking the door to her apartment. According to Mr. Humphries, "It didn't take her long [to walk downstairs] because she was really hauling boggy." (Richard Humphries depo., p. 25).

Moreover, a careful review of the entire depositions of Mr. and Mrs. Humphries discloses no coercion or badgering on their part.

Finally, and perhaps most importantly, the plaintiff candidly conceded at her deposition that her husband did, in fact, slap her in the face on April 29, 1989 in an unprovoked act of aggression. This fact renders all of the peripheral issues raised by the plaintiff (such as the extent of her intoxication, the reasonableness of her fear for her safety, the reasons for the swelling and bruises on her face, and the relative roll that the Humphries played in the arrest) of minimal importance.

In short, the court concludes that no genuine issue of material fact exists as to the probable cause for the arrest of William James on the charge of simple assault and battery, and the plaintiff's first cause of action fails as a matter of law.

### B. Excessive Force

■ In her second theory of recovery, the plaintiff contends that Officer Madden used a constitutionally impermissible degree of force in violation of the Fourth Amendment when he shot and killed her husband. It is now clear that all claims of excessive force during an arrest or other seizure of an individual are governed by the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As the Court explained in *Graham*, the objective reasonableness test requires careful attention to the circumstances of the particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396, 109 S.Ct. at 1871–72. Generally, an officer may not use deadly force in the apprehension of a felon unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985); *see also Slattery v. Rizzo*, 939 F.2d 213 (4th Cir.1991). If the suspect threatens the officer with a weapon, deadly force may be used if necessary to prevent escape and if, where feasible, some warning has been given. *Gar-*

*ner*, 471 U.S. at 11–12, 105 S.Ct. at 1701–02. In this case, Madden contends that his actions were reasonable under the circumstances because Mr. James charged him, waiving a baseball bat and threatening to kill him. Thus, argues Madden, his actions in first warning and then shooting Mr. James, though regrettable, were justified under the circumstances.

The plaintiff's response to this argument is two-fold: The plaintiff first contends that Officers Madden and Hollingsworth created the unfortunate situation which resulted in Mr. James's death, by failing to follow generally accepted police procedures when they entered the James apartment. Specifically, the plaintiff argues that at least one officer should have been posted at the door to the apartment so as to be able to intercept James and alert the other officers in the event that James was not in the apartment and returned to his home while the officers were inside. This is especially true, plaintiff argues, where, as here, the officers had reasonable cause to believe that Mr. James was not in his apartment when they entered it. The plaintiff's theory of what happened in this case is that James, who had apparently left his apartment to obtain more beer, happened upon the officers in his apartment and assumed they were burglars.

Secondly, the plaintiff argues that circumstantial evidence on the scene creates a genuine issue of material fact as to what happened before the fatal shot was fired. Specifically, the plaintiff contends that the physical evidence on the scene, coupled with discrepancies and internal inconsistencies in the statements given by the officers after the accident and in their depositions, all give rise to a reasonable implication that Mr. James was startled to find the officers in his home and picked up the bat to defend himself from what he thought were burglars.

■ The plaintiff's first argument is foreclosed by the decisions of the United States Court of Appeals for the Fourth Circuit in *Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991) and *Drewitt v. Pratt*, 999 F.2d 774 (4th Cir.1993). In *Greenidge*, the plaintiff argued that, rather than taking a "snapshot" of the

scene immediately before the allegedly excessive force was used, the court should trace the chain of events backward to the officer's misconduct in failing to comply with standard police procedures for arrests. The court rejected this argument and held that "the Fourth Amendment's 'objective reasonableness' standard ... requir[es] that the officer's 'liability be determined *exclusively* upon an examination and weighing of the information [the officers] possessed *immediately prior to and at the very moment [they] fired the fatal shot[s].*'" *Greenidge,* 927 F.2d at 792 (quoting *Ford v. Childers,* 855 F.2d 1271, 1275 (7th Cir.1988) (quoting *Sherrod v. Berry,* 856 F.2d 802, 805 (7th Cir.1988) (*en banc* ))). Applying this standard to the facts presented in *Greenidge,* the court held that "events which occurred before Officer Ruffin opened the car door and identified herself to the passengers [ (the failure to employ proper back up and use a flashlight) ] are not probative of the reasonableness of Ruffin's decision to fire the shot. Thus, the events are not relevant and are inadmissible." *Id.* at 792.

The Fourth Circuit reaffirmed *Greenidge* two years later in *Drewitt, supra.* In *Drewitt,* the court held that an off-duty plainclothes police officer who failed to display his badge when attempting to stop a fleeing robbery suspect was entitled to a qualified immunity defense. Relying upon *Greenidge,* the court held that the failure to display the badge (a requirement of state law) was "irrelevant to the issue of whether at the moment of the shooting [the officer] had probable cause to believe that [the suspect] posed a threat of death or serious bodily harm to him." *Drewitt,* 999 F.2d at 780.

Application of the *Greenidge* and *Drewitt* holdings to this case requires the court to focus only upon the reasonableness of the conduct at the moment Officer Madden made the decision to use deadly force. The failure

of the police officers to station a guard at the entrance to the James apartment in the event Mr. James returned while his home was being searched is not relevant here, just as the officer's failure to employ proper back up and use a flash light was inadmissible in *Greenidge,* and the failure to display a badge was irrelevant in *Drewitt.*[4]

█ In essence then, the court must review the reasonableness of Officer Madden's decision to use deadly force as James approached him in the apartment. James was waving a baseball bat over his head while threatening to kill the officer. The officer, dressed in a police uniform, made repeated requests that James drop the bat, retreated as far as he could, and then made the decision to use deadly force. Under the circumstances, Officer Madden had probable cause to believe that James posed a significant threat of serious bodily injury to Madden. The use of deadly force under such circumstances was reasonable.

The plaintiff also challenges Madden's rendition of the events leading up to the shot that killed James. With Mr. James deceased, Madden's testimony is the only eye witness version of what occurred. The plaintiff points to inconsistencies in statements given by Madden and Hollingsworth and physical evidence at the scene of the crime in an effort to raise a genuine issue of material fact as to what happened.

Madden has furnished a total of three statements about the incident: a written statement on April 29, the night of the shooting; a written statement on May 1, as the investigation progressed; and his deposition in this case, which was taken on September 24, 1992. The alleged discrepancies and inconsistencies in the statements are legally insignificant. For example, in the April 29 statement, Madden indicated that Officer

---

**4.** Although it is undisputed that Madden and Hollingsworth identified themselves as police officers when they knocked on the James apartment door, it is not clear from the record whether Madden identified himself as a police officer when he confronted James and told him to drop the bat. Madden was, however, wearing his police uniform. In any event, the failure to specifically shout "police" has been held to be of no

consequence in a case factually similar to this one. *See Linder v. Richmond County, Ga.,* 844 F.Supp. 764 (S.D.Ga.1994) (failure to secure backup, to secure a position of cover, and to use the word "police" in a command to suspect to drop gun had "no bearing on the reasonableness of [the officer's] actions *at the time he was forced to make the decision whether to shoot [the plaintiff's decedent].*") *Id.* at 767.

Hollingsworth was "behind" Madden when Madden entered the living room; but in the statement of May 1, Madden stated that Hollingsworth was out of sight in the rear bedroom. In the April 29 statement, Madden indicated that James was swinging the baseball bat "in a circular motion;" but in his deposition, Madden described James as swinging the baseball bat "from side to side." In his deposition, Madden elaborately described how James fell backward after being shot, stopped still, took more steps backward, and finally fell to the floor in front of the door leading from the kitchen to the living room. In both the April 29 and May 1 statements, Madden says nothing about James stepping backward after he was shot. In the May 1 statement, Madden indicates that he backed up until he could not "go any further." In his deposition, he says he backed into a T.V. table. Madden contends in his deposition that Mrs. Humphries told both officers that James had a gun, a fact verified by Mrs. Humphries in her deposition. Hollingsworth, on the other hand, does not recall Mrs. Humphries referring to a gun, but rather a baseball bat. Hollingsworth, who was in another room when the fatal shot was fired, testified that he did not hear Madden yell "drop it, drop it," but instead heard Madden say "stop, stop ... calm down."

The court has carefully examined these and other alleged inconsistencies in the various statements given by the two officers and concludes that they all deal with peripheral matters that do not raise a genuine issue of *material* fact as to the dispositive issue presented in the motion before the court, to wit, the objective reasonableness of Madden's decision to shoot.

The plaintiff also relies upon the physical evidence at the scene to suggest that James simply walked into his apartment, happened upon the officers, and was shot by a startled Officer Madden. Photographs taken by the South Carolina Law Enforcement Division show that the bag which contained the beer was lying under a green chair approximately ten feet from James's body. A photograph of the bag appears to indicate that it was pierced by a bullet and is stained by blood.

The plaintiff argues that this gives rise to an inference that James was carrying the bag of beer in front of him as he approached Madden inside the apartment, and was thus physically unable to swing a baseball bat above his head with both hands as Madden suggests he did. Thus, plaintiff reasons, an assailant wielding a baseball bat with one arm is less dangerous than one who uses both arms, and Madden had the ability to knock the bat out of James's hand, thereby disarming him and negating the threat of serious bodily harm.

The court is not persuaded by this argument. All four witnesses at the scene (Madden, Hollingsworth, Cynthia Humphries, and Richard Humphries) saw James approach Madden waving a baseball bat. Both Mr. and Mrs. Humphries verified Madden's assertion that James indicated that he was going to kill Madden. Discounting Madden's statement that the bat was held in both hands and accepting, for purposes of this motion, the plaintiff's contention that James held a bag of beer in one hand and a baseball bat in the other, the court nevertheless concludes that the force used by Madden was reasonable under the circumstances.

The plaintiff also refers to the absence of powder burns on James's body and the testimony of the pathologist for her assertion that her husband died of a "distant gun shot wound." However, Dr. Joel Sexton, the pathologist, indicated in his deposition that the absence of powder burns would mean only that the gun was fired at a distance of 18 inches or more from James's body. Therefore, the pathologist indicated that he did not feel qualified to assess the distance between the participants in the shooting (Dr. Joel Sexton depo., p. 7).

Finally, the plaintiff argues that the location of the bat and the can of beer, some distance from Mr. James's body, constitutes circumstantial evidence that the body, the bat, or the beer, or perhaps all three, were moved before investigators arrived. There is also the suggestion that James may have not wielded a bat at all, but that perhaps the bat was "planted" on the floor by the officers. The distance from the body to the bag of beer is explained in the record. Hollings-

worth testified that as he approached James's body, he observed the bag and, not knowing what was in it, shoved it across the room with his baton. Although the bat was not immediately adjacent to the body, the court cannot ignore the fact that round objects, such as bats, roll on flat surfaces. Moreover, if the officers had intended to "plant" a bat so as to provide a defense, they assuredly would have planted it nearer to the body for effect.

For all of the foregoing reasons, the defendants' motion for summary judgment on the excessive force claim must be granted.

### C. Equal Protection

█ The plaintiff's first cause of action also makes a vague allegation of an equal protection violation. However, the complaint does not contain any factual allegations to support such a claim, and the plaintiff does not address this claim in her memorandum opposing the defendants' summary judgment motion. The equal protection guarantee of the Fourteenth Amendment only applies to governmental actions which classify individuals for different benefits or burdens under the law; it does not govern actions which do not classify individuals. In the present case, the plaintiff fails to demonstrate how the actions of the defendants created any classifications. For this reason, the plaintiff has failed to prove that William James's equal protection rights were violated.

### II. Claims Against the City of Chester, the Chester Police Department, and Police Chief Lawrence Strait

### A. Supervisory Liability

The plaintiff has also asserted a claim against the City of Chester, its police department, and its chief of police, contending that these defendants failed to properly train police officers and that this failure rose to the level of deliberate indifference. Two expert witnesses are prepared to testify, on behalf of the plaintiff, that the police department should have trained its officers to carefully execute a plan when entering a dwelling and that the department should have promulgated and enforced a policy regarding the use of deadly force by its officers. Also, the expert witnesses fault Officers Madden and Hollingsworth for not qualifying with their firearms on a more frequent basis, and find fault with the city for issuing to its officers .357 magnum pistols and flapjacks, but no intermediate-level defensive weapons.

█ Because the court has determined that the claims against Officer Madden fail as a matter of law, it follows that the claims for supervisory liability against the remaining defendants must be dismissed as well. There is no liability on the part of supervisory officials in the absence of a constitutional violation on the part of the person supervised. *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Temkin v. Frederick County Commissioners*, 945 F.2d 716, 724 (4th Cir.1991); *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990).

### III. State Law Claims

Finally, the plaintiff asserts a cause of action under South Carolina state law for negligent and reckless conduct. Under 28 U.S.C. § 1367(c)(3), a federal court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction. Because the court has determined that all of the plaintiff's federal causes of action must be dismissed, the court will exercise its discretion to decline jurisdiction over the supplemental state-law claims.

### IV. Conclusion

For all of the foregoing reasons, the defendants' motion for summary judgment as to the first cause of action is granted, and all claims asserted in that cause of action are dismissed, with prejudice. The court declines to exercise supplemental jurisdiction over the state-law claim asserted in the second cause of action, which is dismissed without prejudice.

IT IS SO ORDERED.