Deborah Jean INGLE, Administrator of the Estate of Christopher James Burt Ingle, Plaintiff,

v.

Mike YELTON, in his official and individual capacities; Chris Young, in his official and individual capacities; Joe Johnson, in his official and individual capacities; and the City of Asheville, Defendants.

No. CIV. 1:03CV199.

United States District Court, W.D. North Carolina, Asheville Division.

Nov. 19, 2004.

Kyle King, Asheville, NC, for Plaintiff.

Frederick S. Barbour, Rendi L. Mann-Stadt, McGuire, Wood & Bissette, P.A., Asheville, NC, for Defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on Defendants' motion to dismiss under Fed. R.Civ.P.12(b)(1) or, alternatively, for summary judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

In the early morning hours of July 15, 2001, law enforcement officers were dispatched to the scene of a domestic shooting at the home of Burt Ingle, the father of Christopher Ingle ("Ingle" or "the suspect"). Defendants' Brief in Support of the Motion to Dismiss or, in the Alternative, for Summary Judgment ["Defendants' Brief"], filed April 2, 2004, at 1. Ingle is alleged to have fired his shotgun at his father and sister, striking them both, following an altercation. *Id.* Ingle fled the scene of the shooting in his father's red dual axle pickup truck. *Id.* Later, a red pickup truck matching the description of the vehicle Ingle had taken, was spotted by Asheville City Police Officer Curtis Jones. Officer Jones attempted to stop the pickup truck but the driver refused to stop. *Id.*, at 5; Affidavit of Owen Curtis Jones, *attached to* Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment ["Defendants' Motion"], filed April 2, 2004, ¶¶ 5–7. Along with other Asheville City Police officers and Buncombe County Sheriff's Department officers, Officer Jones engaged in a high speed pursuit of the red pickup truck, which ended when the truck pulled into the Holiday Inn SunSpree parking lot in Asheville, North Carolina. *Id.*, ¶ 8. While in the hotel parking lot, the driver was seen by some of the officers to be in possession of a shotgun. Defendants' Brief, at 6. Several officers also reported hearing shotgun blasts fired from the truck while it was in the hotel parking lot. *See, e.g.,* Affidavit of William Michael Yelton, *attached to* Defendants' Motion, ¶ 23; Affidavit of Joseph Scott Johnson, *attached to* Defendants' Motion, ¶¶ 7, 11; Jones Affidavit, *supra,* ¶ 10; Affidavit of Charles Edward Sams, *attached to* Defendants' Motion, ¶ 12.

Once the truck came to a stop in the breeze way of the hotel's front entrance, it was surrounded by officers, including Defendant Officers Mike Yelton, Chris Young, and Joe Johnson. Defendants' Brief, at 6. At one point, the driver opened the truck door and stepped out with the shotgun pointed upward in his right hand. Yelton Affidavit, ¶ 27. At that time, Officer Yelton believed the driver was going to surrender, but instead, the driver suddenly got back into the truck and closed the door. *Id.*, ¶ 27, 28. The officers were yelling at the driver inside the truck to drop the gun and show his hands. *Id.* The night manager at the hotel, who was awakened by the commotion, heard the officers yelling at the driver to throw out his weapon, show his hands, and not to move. Affidavit of Connie Nuckolls, *attached to* Defendants' Motion, ¶¶ 4, 8. The officers then observed the driver begin to lean back in the front seat of the truck.[1] Yelton Affidavit, ¶ 29. As the driver leaned back, the shotgun was slowly lowered towards the direction of Officer Yelton and another officer. *Id.*, ¶ 30. As the shotgun barrel was lowered and aimed towards some of

---

1. In his affidavit, Officer Yelton stated that the driver appeared to him to be trying "to take cover." Yelton Affidavit, ¶ 29.

the officers, Officers Yelton, Young, and Johnson fired their weapons at the driver in the truck. *Id.*, at 31; Johnson Affidavit, ¶ 13; Affidavit of Christopher Lee Young, *attached to* Defendants' Motion, ¶ 15.

After firing at the truck and unable to see the driver, officers approached the truck from the rear, removed the gun which was hanging out the shattered window, and pulled the driver, identified as Ingle, out of the truck to be handcuffed. Yelton Affidavit, ¶¶ 35, 36, 38. The officers quickly realized that Ingle had been killed in the shooting. Young Affidavit, ¶ 22.

On July 14, 2003, Deborah Jean Ingle, Ingle's mother and administrator of his estate, filed suit against Officers Yelton, Young, Johnson, and the City of Asheville in state court pursuant to 42 U.S.C. § 1983, for use of excessive force in violation of Ingle's Fourth Amendment rights. Plaintiff also alleged violations of N.C. Gen.Stat. §§ 28–A–18–1 and 18–2, and the North Carolina Wrongful Death Statute. The action was removed to this Court by Defendants on August 11, 2003. Defendants initially filed a motion to dismiss under Rule 12(b)(6) on August 29, 2003, to which Plaintiff filed a response and Defendants filed a reply thereto. On March 18, 2004, following the Magistrate Judge's Memorandum and Recommendation, this Court denied Defendants' motion to dismiss without prejudice to renewal under Rule 12(b)(1), Rule 12(b)(6), or Rule 56. On April 2, 2004, Defendant filed a motion to dismiss under Rule 12(b)(1) or, in the alternative, a motion for summary judgment under Rule 56. Plaintiff's response and Defendants' reply have been duly filed thereto.

## II. DISCUSSION

### A. Standard of Review

The doctrine of qualified immunity protects government officials from civil liability in the performance of discretionary functions where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity not only protects government officials from liability but also shields them from the burdens and hardships of litigation itself. *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir.1991). Therefore, the Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of litigation." *Anderson v. Creighton*, 483 U.S. 635, 646, n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citing *Harlow, supra* ). For this reason, the Fourth Circuit has found that summary judgment is "a particularly appropriate procedure for determining an official's entitlement to qualified immunity[.]" [2] *Torchinsky, supra.*

Summary judgment is appropriate when there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact arises where evidence exists such that a reasonable jury could find for the non-moving party. *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When evaluating an assertion of qualified immunity under summary judgment, "the facts are to be '[t]aken in the light most favorable to the party asserting the injury.' " *Clem v. Corbeau*, 284 F.3d 543, 550–51 (4th Cir.2002) (quoting *Saucier*

---

**2.** Following Fourth Circuit precedent, the Court will treat Defendants' motion as one for summary judgment under Rule 56 instead of a motion to dismiss under Rule 12(b)(1).

*v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). As important as it may be to establish the validity of an assertion of qualified immunity, the Court must not skew the summary judgment doctrine from its ordinary operation and must not give " 'special substantive favor' " to the party asserting the immunity. *Wilson v. Kittoe,* 337 F.3d 392, 397 (4th Cir. 2003) (quoting *Pritchett v. Alford,* 973 F.2d 307, 313 (4th Cir.1992)).

## B. Federal Claims against Officers

When evaluating an assertion of qualified immunity by a law enforcement officer, the Court must undertake two inquiries. *Saucier, supra.* First, the Court must determine if, in the light most favorable to the injured party, "the facts alleged show the officer's conduct violated a constitutional right." *Id.* If the Court answers this in the negative, there is no need for further inquiry and summary judgment should be granted in favor of the officer. *Id.* If the Court answers the first inquiry in the affirmative, it must then also find that the right was clearly established before qualified immunity is abrogated. *Id.*

Excessive or deadly force used by a law enforcement officer implicates the Fourth Amendment rights of an individual.[3] *Elliott v. Leavitt,* 99 F.3d 640, 643 (4th Cir. 1996). A claim alleging excessive or deadly force under the Fourth Amendment will be analyzed under a " 'reasonableness' standard." *Id.,* at 642 (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Generally, use of deadly force by an officer is not excessive where the officer "has probable cause to believe that a suspect poses a threat of

serious physical harm to the officer or others." *McLenagan v. Karnes,* 27 F.3d 1002, 1006–07 (4th Cir.1994). Under the objective standard utilized, "[t]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell,* 247 F.3d 125, 129 (4th Cir.2001). The Supreme Court has discouraged the use of 20/20 hindsight when evaluating "reasonableness," instead opining that "a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The Court's focus should be *"exclusively"* on the information known to the officers " *'immediately prior to and at the very moment [they] fired the fatal shot[s].'* " *Greenidge v. Ruffin,* 927 F.2d 789, 792 (4th Cir.1991) (quoting *Sherrod v. Berry,* 856 F.2d 802, 804 (7th Cir.1988)); *see also Elliott, supra* ("The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection.").

The Supreme Court has identified several factors that may be considered in judging the reasonableness of the use of force under the Fourth Amendment. The Court must examine all the facts and circumstances surrounding each use of force, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, supra.* The Court must also recognize that law enforcement officers "are forced to make split-second judgments—in circumstances that are tense,

---

**3.** The Fourth Amendment guarantees "that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The

Supreme Court has said, "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner,* 471 U.S. 1, 9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*, at 396–97, 109 S.Ct. 1865.

Here, the Court must examine the circumstances and the information known to Officers Young, Johnson, and Yelton immediately before they fired the shots killing Ingle. The evidence shows that on the night and early morning prior to the shooting, Officers Yelton, Young, and Johnson were all aware that the driver of the red truck was potentially armed and dangerous. The officers were aware that Ingle, the likely driver of the red truck, was a suspect in a double shooting that occurred earlier that night. Yelton Affidavit, ¶ 8; Johnson Affidavit, ¶¶ 5–6; Young Affidavit, ¶¶ 6–13. They all either participated in, or were apprised of over the radio, the high speed chase that occurred following the attempted initial apprehension, and thus were aware the suspect initially refused to stop. Yelton Affidavit, ¶¶ 14, 15; Johnson Affidavit, ¶ 6; Young Affidavit, ¶ 9. All the officers, at some point during the encounter, saw the shotgun in the hand of the driver. Young Affidavit, ¶ 14; Yelton Affidavit, ¶ 26; Johnson Affidavit, ¶ 11. Additionally, all three officers believed the driver of the truck might have fired the shotgun at officers during the pursuit. Officer Young heard a communication over the radio that shots had been fired from the suspect's car. Young Affidavit, ¶ 11. Officers Yelton and Johnson both stated they heard a loud shotgun blast as they approached or while present at the scene

which they believed came from the direction of the suspect's truck. Yelton Affidavit, ¶ 23; Johnson Affidavit, ¶¶ 7, 11.

■ The officers also observed that the driver of the truck was not cooperating with the demands of the police officers surrounding his truck.[4] Once the truck had stopped, Officer Yelton was yelling continuously at the suspect to drop the gun. Yelton Affidavit, ¶¶ 28–30. Officers Young and Johnson heard Officer Yelton shouting orders at the suspect in the truck. Young Affidavit, ¶ 14; Johnson Affidavit, ¶ 10. Officer Young also yelled at the suspect to put his hands in view of the officers. Yelton Affidavit, ¶ 17. Officers Yelton and Young also observed Ingle inside the truck leaning back while the barrel of the gun moved downward towards Officer Yelton, again disobeying the commands of the officers. Yelton Affidavit, ¶ 29; Young Affidavit, ¶ 15.

Finally, the officers chose to fire their weapons at the driver of the truck when they feared for their own safety or that of other officers on the scene. Officer Johnson fired a single shot at the driver side of the truck after he felt he was in danger once Ingle began aiming his gun at other officers because he was not in a position that provided cover if Ingle aimed and fired at him. Johnson Affidavit, ¶¶ 11, 12. Officer Johnson also stated that he feared for the safety of the other officers in the direction where Ingle was aiming the shotgun. *Id.* Officer Yelton stated that prior

---

4. Plaintiff argues that is was "extremely improbable" that Ingle heard the officer's warnings prior to the shooting. Plaintiff's Response to Defendants' Motion for Summary Judgment, filed May 27, 2004, at 6. However, it is the perceptions of the officers prior to the shooting which are relevant to the determination of the reasonableness of their use of force. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The officers situated around the

truck were able to hear the warnings and commands of other officers on the scene and, therefore, believed the suspect in his truck could hear them as well. Additionally, the Court notes that the night manager at the Holiday Inn, standing inside the hotel behind a wooden column and 30 feet from sliding glass doors, was able to hear the commands of the officers located outside surrounding the truck. Nuckolls Affidavit, ¶¶ 7, 8.

to firing his weapon at the suspect, he feared for his own safety and that of Officer Sams, who was standing with him, when the driver aimed the shotgun in their direction. Yelton Affidavit, ¶¶ 30, 31. Officer Young, standing at a different position, stated he only fired after also seeing the driver aim his shotgun at Officers Sams and Yelton. Young Affidavit, ¶ 15.

At the moment in time immediately prior to the officers firing at and fatally wounding Ingle, all three officers believed the suspect was armed and dangerous, knew he was ignoring their commands, and feared an imminent threat to their own safety or that of the other officers present at the scene.[5] Therefore, under these circumstances as perceived by the officers, the use of deadly force against the suspect was reasonable. *See Anderson,* 247 F.3d at 131 (finding the officer's use of force was reasonable given that, from the officer's perspective, the suspect was failing to obey his commands and reached for a bulge in his clothing, thus justifying the officer's fear for his safety even though suspect turned out to be unarmed).

The Plaintiff claims a material issue of fact exists as to whether the driver's window of the truck was rolled up. Many of the officers at the scene, including these Defendants, stated that the barrel of the shotgun was protruding from this window of the suspect's truck prior to the officers firing at the suspect. Plaintiff's Response to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment ["Plaintiff's Response"], filed May 27, 2004, at 5; *see, e.g.,* Yelton Affidavit, ¶ 29 ("I saw the barrel of the shotgun out of the window."); Report of Interview of Joseph

Johnson on July 15, 2001, by N.C. State Bureau of Investigation, at 4 ("[he] looked up to see the shotgun pointed out the driver's window toward the parking lot and several officers ..."); Report of Interview of Christopher Young on July 15, 2001, by N.C. State Bureau of Investigation, at 10 ("Young saw the barrel of the shotgun extend out of the window ..."). However, the Plaintiff has offered an affidavit from an expert who, after examining the SBI's report and numerous pictures of the truck, has concluded that the window was rolled all the way up before Ingle was fired upon by the officers. Affidavit of Russell C. Lindsay, *attached to* Plaintiff's Response, at ¶¶ 5–6. As evidence, the Plaintiff's expert identifies photographs showing pieces of glass still attached to the entire perimeter of the driver's side window. *Id.,* at ¶ 5. The Plaintiff's expert asserts that pieces of glass would only be attached to the higher portions of the side of the widow, as purportedly shown in the pictures, if the window was completely rolled up when it was shattered by the gunfire. *Id.*

However, the Court finds that whether the window was rolled up or rolled down does not change the nature of the circumstances or the imminent threat perceived by the officers. *See Anderson,* 247 F.3d at 130–31 (finding the uncertainty as to the speed and position at which the suspect was lowering his hands as immaterial to the officer's imminent fear for his safety and the safety of others); *James v. City of Chester,* 852 F.Supp. 1288, 1296 (D.S.C. 1994) (finding differences in officer's testimony and physical evidence offered by injured party immaterial to determination of reasonableness of officer's use of deadly force). Viewing the evidence in the light

---

**5.** The fact that Ingle was surrounded in the breeze way at the hotel's front entrance and blocked from leaving the parking lot does not alter the reasonableness of the officers' actions. The officers did not shoot Ingle be-

cause they feared he would exit the vehicle and flee, but rather because of the imminent threat he posed to the safety of the officers on the scene.

most favorable to the injured party, and assuming that the window was completely rolled up prior to the officers' firing, the officers were still aware that the suspect was armed, not cooperating with their commands, and was aiming the shotgun in the direction of Officers Yelton and Sams. Plaintiff has admitted that Ingle was armed at the time of the shooting, and has conceded that Ingle may have fired one shot at the scene. Plaintiff's Response, at 6. Further, whether the window was up or down, the officers could see into the car and see the movements the suspect was making with the shotgun. Officer Johnson indicated that because of the direction of the headlights of the police cars at the scene, the inside cab of the truck was well illuminated. Johnson Interview, at 5. Officer Young indicated he could see the suspect's movements in the truck. Young Affidavit, ¶ 14. Officer Yelton was also able to specifically describe the suspect's movements in the truck. Yelton Affidavit, ¶ 28, 29. Therefore, even if the truck window was rolled up and the barrel was not protruding from the window as the officers' have testified, their use of deadly force was reasonable under the circumstances.

The Court finds that Defendants have put forth evidence that the officers' use of deadly force was reasonable under the circumstances. Plaintiff has failed to produce evidence that would demonstrate that there is a genuine issue of material fact as to the reasonableness of the officers' conduct. Therefore, Defendants are entitled to qualified immunity as a matter of law and summary judgment for the Defendants is allowed.

## C. Plaintiff's State Law Claims versus Officers

■ Plaintiff also alleges violations of N.C. Gen.Stat. §§ 28–A–18–1, 28–A–8–2

and the North Carolina Wrongful Death Statute. However, because the Court finds the officers acted reasonably as a matter of law in the use of deadly force under these circumstances, they were not negligent or wrongful as required to make out a claim under the state statutes. *See Sigman v. Town of Chapel Hill,* 161 F.3d 782, 789 (4th Cir.1998). Therefore, summary judgment for the Defendants on Plaintiff's state law claims is allowed.

## D. Claims versus the City of Asheville

■ A city cannot be liable for the acts of its officers where the Court does not find an underlying use of excessive force. *Id.,* at 788. Therefore, Plaintiff's claims against the City of Asheville fail because the Court has found as a matter of law that the officers acted reasonably in using deadly force against Ingle. *Id.* Defendant City of Asheville's motion for summary judgment is, therefore, allowed.

## III. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment is **ALLOWED.** A Judgment dismissing all of the Plaintiff's claims is filed herewith.

## *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Defendants' motion for summary judgment is **ALLOWED,** and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.