UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 96-1150(L)
(CA-93-4078-PJM)

Dorothy C. Elliott, etc., et al,

                              Plaintiffs - Appellees,

          versus

Jason Leavitt, etc.,

                              Defendant - Appellant.

O R D E R

     The Court amends its opinion filed November 8, 1996, as follows:

     On page 3, section 2, line 3 -- Andrew Jensen Murray's title is corrected to read "Associate County <u>Attorney</u>."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                              _____
                                       Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DOROTHY C. ELLIOTT, Individually
and as Co-Personal Representative
of the Estate of Archie Elliott, III;
ARCHIE ELLIOTT, JR., Individually
and as Co-Personal Representative
of the Estate of Archie Elliott, III,
Plaintiffs-Appellees,

v.

JASON LEAVITT, Police Officer for
District Heights, MD,

                                No. 96-1150

Defendant-Appellant,

and

PRINCE GEORGE'S COUNTY,
MARYLAND; DAVID B. MITCHELL,
Prince George's County Police
Chief; WAYNE CHENEY, Police
Officer; CITY OF DISTRICT HEIGHTS,
MD; MICHAEL CONBOY, Police Chief
for District Heights, MD,
Defendants.

DOROTHY C. ELLIOTT, Individually
and as Co-Personal Representative
of the Estate of Archie Elliott, III;
ARCHIE ELLIOTT, JR., Individually
and as Co-Personal Representative
of the Estate of Archie Elliott, III,
Plaintiffs-Appellees,

v.

WAYNE CHENEY, Police Officer,
Defendant-Appellant,

No. 96-1151

and

JASON LEAVITT, Police Officer for
District Heights, MD; PRINCE
GEORGE'S COUNTY, MARYLAND;
DAVID B. MITCHELL, Prince George's
County Police Chief; CITY OF
DISTRICT HEIGHTS, MD; MICHAEL
CONBOY, Police Chief for District
Heights, MD,
Defendants.

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-93-4078-PJM)

Argued: September 25, 1996

Decided: November 8, 1996

Before WILKINSON, Chief Judge, and WILKINS and
WILLIAMS, Circuit Judges.

_____

2

Reversed by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Wilkins and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Daniel Karp, ALLEN, JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellant Leavitt; Andrew Jensen Murray, Associate County Attorney, Upper Marlboro, Maryland, for Appellant Cheney. Robert W. Mance, III, MUNDY, HOLT & MANCE, Washington, D.C., for Appellees. **ON BRIEF:** Denise Ramsburg Stanley, ALLEN, JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellant Leavitt.

_____

**OPINION**

WILKINSON, Chief Judge:

The parents of Archie Elliott III brought suit under 42 U.S.C. § 1983 alleging that police officers Jason Leavitt and Wayne Cheney used excessive force in the course of arresting Elliott for driving while intoxicated. The district court denied the officers' motion for summary judgment, and the officers filed this appeal challenging the court's refusal to grant them qualified immunity. We reverse the judgment of the district court, finding that the officers' use of deadly force in response to an obvious, serious, and immediate threat to their safety was reasonable under Graham v. Connor, 490 U.S. 386 (1988). The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm.

I.

On June 18, 1995, police officer Jason Leavitt stopped motorist Archie Elliott. Elliott smelled of alcohol, and he admitted that he had been drinking excessively. Elliott failed several sobriety tests and was having trouble walking. Leavitt called for backup, handcuffed Elliott, and advised him that he was under arrest for driving while intoxicated. Leavitt briefly searched Elliott, finding no weapon or other

3

contraband. Leavitt remembers checking the back side of Elliott's body but does not recall whether he checked the front.

Officer Wayne Cheney soon joined Leavitt on the scene. Cheney assisted Leavitt in placing Elliott in the front passenger seat of Leavitt's police car with the seatbelt fastened, the door closed, and the window rolled up.

The officers were talking by the passenger side of the car when Leavitt noticed a movement and looked to find Elliott with his finger on the trigger of a small handgun pointed at Leavitt and Cheney. Cheney also saw the gun. Elliott was very thin; he had released the seat belt and twisted his arms to the right side of his body to position the weapon. Leavitt yelled, "Gun!," and ordered Elliott to drop it. After Elliott did not respond, Leavitt and Cheney commenced firing, killing Elliott. The officers did not discharge all of their bullets; 22 were fired while 10 were found still in their weapons. Cheney then retrieved the gun, which had remained clasped in Elliott's hand.

A grand jury declined to take action on the shooting, and an internal affairs investigation recommended that both officers be exonerated. The investigation revealed that a few months prior to the shooting, Elliott had threatened a motorist with a handgun. In a sworn statement, the motorist identified the gun recovered from Elliott's body as the same one used to threaten him. An FBI lab report revealed that a blue fiber caught on the gun came from Elliott's shorts. Elliott's parents, as representatives of his estate, then brought this § 1983 excessive force claim against Leavitt and Cheney.

II.

Claims that law enforcement officers used excessive force when making an arrest "should be analyzed under the Fourth Amendment and its `reasonableness' standard." Graham, 490 U.S. at 395. The standard of review is an objective one. The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. Id. at 396-97. A police officer may use deadly force when the officer has sound reason to believe that a

4

suspect poses a threat of serious physical harm to the officer or others. Tennessee v. Garner, 471 U.S. 1 (1985).

This circuit has recognized the doctrine of qualified immunity in excessive force cases, and the inquiry under Graham must reflect the considerations underlying the analysis of an immunity defense. See Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991). A reviewing court may not employ "the 20/20 vision of hindsight" and must make "allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97. The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection. Greenidge v. Ruffin, 927 F.2d 789, 791-92 (4th Cir. 1991) (citing Graham, 490 U.S. 386).

A.

Appellees suggest that Elliott did not pose a real threat to the officers, noting that his hands were handcuffed behind his back, that he was placed in the front passenger seat with the seatbelt fastened and the window up, and that the officers were outside the car at the time of the shooting. Such a conclusion, however, is untenable in light of uncontroverted evidence that immediately before firing, Leavitt and Cheney confronted an intoxicated individual pointing a gun at them from only a few feet away with his finger on the trigger. The car window was no guarantee of safety when the pointed gun and the officers at whom it was aimed were in such close proximity. Moreover, expert testimony in the summary judgment record emphasized that even suspects with their hands handcuffed behind their backs have been able to position a concealed weapon so as to fire at an arresting officer.

We have upheld the use of deadly force in cases where the nature and extent of the threat was much less clear to the officers than it was in the case before us. In Greenidge, 927 F.2d 789, for example, we affirmed the judgment in favor of Officer Ruffin although Ruffin was unable to confirm the nature of the weapon before she used deadly force to protect herself. Ruffin witnessed two individuals performing an illegal sex act in a car. She drew her revolver when neither responded to her order to place their hands in view. Ignoring a second

5

order, one of the passengers reached for a long cylindrical object behind the seat. Although the object turned out to be a wooden nightstick, Ruffin believed that it was a shotgun and fired in self-defense. In contrast, here both Leavitt and Cheney clearly saw that Elliott had a handgun. We also note that, like Officer Ruffin, the officers did not immediately use deadly force but fired only after Elliott ignored the order to drop his weapon.

In Slattery, 939 F.2d 213, we held that an officer reasonably felt threatened in a situation where he could not see the suspected weapon at all. During a narcotics arrest, Officer Rizzo went to take custody of Slattery, a passenger in a suspect's car. Rizzo drew his revolver after Slattery ignored repeated orders to place his hands in view. Rizzo could not see Slattery's left hand but could tell that it was partially closed around an object. In response to yet another order to raise his hands, Slattery turned his entire upper body toward the officer. Believing that Slattery was coming at him with a weapon, Rizzo fired. The object later was identified as a beer bottle. We upheld Rizzo's use of force even though he could not confirm that the suspect was holding a weapon and even though it was not entirely clear that Slattery's movement was the beginning of an attack. Here it was obvious that Elliott had a gun pointed at the officers ready to fire. Given the significantly greater clarity of the threat in this case, Greenidge and Slattery compel us to conclude that Leavitt and Cheney's use of deadly force was reasonable under the circumstances.

B.

Both appellees and the district court suggest to us several grounds on which Greenidge and Slattery might be distinguished. None of those grounds, however, serve to vitiate the use of force employed in this case.

The district court stated that "arguably it's not clear what [Elliott was] intending to do with the weapon except perhaps move his hands around and be threatening, but the officers on the outside certainly don't have to go on the inside; they can move farther away." This suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits. Furthermore, even if Elliott's specific intent were relevant, it is not

6

clear what other evidence of intent the district court would require -- Elliott was pointing his gun at the officers with his finger on the trigger and ignored the order to drop his weapon. Given the officers' proximity to the car, it is also unclear that they could have moved away from the car quickly enough to avoid being shot.

The critical point, however, is precisely that Elliott was "threatening," threatening the lives of Leavitt and Cheney. The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists. The court's comment that the officers could have moved away from the car is, unfortunately, a suggestion more reflective of the "peace of a judge's chambers" than of a dangerous and threatening situation on the street. See Graham, 490 U.S. at 396.

The district court's concern that the number of shots fired was excessive is likewise misplaced. The number of shots by itself cannot be determinative as to whether the force used was reasonable. Both officers fired almost simultaneously; neither officer emptied his gun; and the evidence indicates that the shooting took place within a matter of seconds. That multiple shots were fired does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat.

Appellees make much of the fact that Leavitt searched Elliott only cursorily before placing him in the car. Even assuming Leavitt should have conducted a more intensive search, this issue is irrelevant to the excessive force inquiry. As we noted in Greenidge, Graham requires us to focus on the moment force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force. Greenidge, 927 F.2d at 791-92. In Greenidge we specifically rejected appellants' argument that Officer Ruffin's failure to obtain proper backup and employ a flashlight was relevant: In light of "the Supreme Court's focus on the very moment when the officer makes the `split-second judgments,' . . . events which occurred before Officer Ruffin opened the car door and identified herself to the passengers are not probative of the reasonableness of Ruffin's decision to fire the shot." Id. at 792.

Finally, we must reject appellees' contention that Elliott's intoxication somehow made him less threatening. The record suggests the

7

contrary. Elliott's aggressive, intoxicated behavior appears to have motivated Leavitt to focus on handcuffing Elliott and placing him in the car rather than on conducting an exacting search which would have forced Leavitt to remain in close proximity to Elliott. Expert testimony was also placed in the summary judgment record supporting the unremarkable proposition that intoxicated suspects are often more dangerous to police officers than sober ones.

No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life. As Greenidge and Slattery illustrate, the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm -- the Constitution does not require that certitude precede the act of self protection.

C.

Appellees maintain finally that the denial of summary judgment was proper due to the existence of factual disputes between the parties. Because there is no evidence to demonstrate the existence of a genuine issue of material fact, however, we find that the officers' appeal of the denial of qualified immunity is properly before us and that the officers are entitled to summary judgment.

We note first that although the district court denied summary judgment on the ground that a material issue of fact exists, this interlocutory appeal is not improper under Johnson v. Jones, 115 S. Ct. 2151 (1995). In Johnson, the Court held that "a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a `genuine' issue of fact for trial." Id. at 2159. The next term, however, the Court qualified this potentially broad proposition. See Behrens v. Pelletier, 116 S. Ct. 834 (1996). The Behrens Court stated that Johnson does not invariably prohibit appeal of a denial of summary judgment where the denial is based on the alleged existence of an issue of fact. Behrens, 116 S. Ct. at 842.

8

"Every denial of summary judgment ultimately rests upon a determination that there are controverted issues of material fact," the Court noted, "and Johnson surely does not mean that every denial of summary judgment is nonappealable." Id. (emphasis in the original).

This appeal is properly before us under Behrens because it does not involve whether "particular conduct occurred," but rather an issue of law -- whether uncontroverted conduct represented the use of excessive force. As to the material facts here, there is no genuine dispute because plaintiff has come forward with no evidence. See id. at 840 ("On summary judgment, however, the plaintiff can no longer rest on the pleadings, and the court looks to the evidence before it" in determining whether a defendant is entitled to qualified immunity.).

With regard to material facts, appellees provide only speculation. They claim that the officers' account of events is not credible because it is improbable, but present no evidence to contradict the officers' testimony. Their only specific, material factual contention is that Elliott did not in fact have a gun at the time of the shooting. Appellees fail, however, to point to any evidence in the summary judgment record that would support their theory that the gun was planted by police.

In contrast, the officers' claim that Elliott was holding a gun when they shot him is corroborated by substantial evidence. A medical examiner, for example, testified that the best explanation for wounds on Elliott's right hand was that he had been holding something at the time of the shooting. In addition, the FBI lab report concluded that the blue fiber caught on the gun came from Elliott's shorts. Finally, the motorist that Elliott had threatened a few months before identified the gun in an affidavit as the one Elliott had used in that prior incident.

The other facts referenced by appellees are not controverted and do not alter the inescapable conclusion that the officers were confronted with a serious threat to their safety. Leavitt's search, Elliott's intoxication, the number of shots fired, the positioning of Elliott and the officers at the time of the shooting, and the manner in which Elliott was restrained do not change the fact that Leavitt and Cheney faced an individual at close range who was pointing a gun at them with his finger on the trigger.

9

III.

Inasmuch as the force used by the officers was objectively reason-
able under <u>Graham</u>, we reverse the judgment of the district court. We
remand the case with directions that it be dismissed.

<u>REVERSED</u>

10