OPINION
NIEMEYER, Circuit Judge:
After Mark Sigman was fatally shot during a standoff with Chapel Hill, North Carolina police officers, Sigman’s parents brought suit under 42 U.S.C. § 1983 against the police officers and the town of Chapel Hill, alleging excessive force in violation of the Fourth, Eighth, and Fourteenth Amendments, and under N.C. Gen.Stat. § 28A-18-2, alleging wrongful death. The district court granted the defendants’ motion for summary judgment on both claims, holding that the police officer who shot Sigman acted reasonably in the circumstances confronting him. We affirm.
I
About 9:30 p.m. on May 22, 1993, Donna Solomon yelled to her neighbors to call 911 to request help in connection with a domestic dispute between her and her live-in boyfriend, Mark Sigman. When Chapel Hill police officers Anthony Brooks and Jack Terry arrived at the duplex where Solomon and Sigman lived, Solomon met them on the front lawn and told them that Sigman was inside the house and out of control and that she wanted the police to help calm him down. She also told the officers that Sigman had recently been laid off from his job and had drunk five or six beers. Although she initially told the officers that she did not think Sigman had access to any weapons, she later told Officer Terry that Sigman had a knife.
When the two officers approached the duplex and knocked on the front door, Sigman told them to “get the hell away from the door.” Because Officer Terry was familiar with Sigman, he attempted to engage Sigman in conversation. But as he did, the officers heard beating and banging at the door, and Sigman began screaming, “You had better get on down the road,” “Go get on down the road, or I’m going to cut your head off,” and “I’m going to kill her.” He also broke a glass window beside them. The officers drew their guns and retreated. The two officers then called for the assistance of the on-duty supervisor, Officer Stephen Riddle.
When Officer Riddle arrived on the scene, Officer Terry informed him of the situation, telling him that Sigman was inside the house enraged, was throwing things, and was armed with a knife. Donna Solomon informed Officer Riddle that Sigman had been drinking, that he had cut himself, and that he was destroying things inside the house. At this point, Officers Peter Wan, John McKer-lie, and Rebecca Snyder arrived on the scene. As the commanding officer on the scene, Officer Riddle instructed the other officers to form a perimeter around the house.
Officer Riddle then attempted to talk to and calm Sigman, whom Riddle perceived to be “highly volatile.” In response, Sigman called him a “mother f — ker,” and said, “I’m going to kill you.” He threw objects at Officer Riddle through the broken window *785 and reached through the window with his knife “to emphasize his point.” Officer Riddle then approached the window, broke the rest of the glass with his baton, and attempted to pepper spray Sigman. But Sigman began swinging a knife at Riddle through the window, and Riddle retreated. Riddle then trained his police car lights on the house and called a special emergency response team for back up. Sometime during this interaction, Officer Riddle asked Sigman to come out, but Sigman replied with words similar to, “If you want me, come in and get me. But you’re going to get hurt.”
Before the emergency response team could arrive, Sigman stepped out of the house, and, according to all of the police officers, he held a knife in his right hand. He was disheveled and bloody, and the knife he carried was a chefs knife with the tip broken off. Officers Riddle, Brooks, and Terry yelled for Sigman to drop the knife and stop approaching. Although they gave these warnings several times, Sigman ignored them, making statements such as, “Go ahead and shoot me” and “I want to die.” By this time, a crowd had gathered along the street behind the officers some distance away and was cheering Sig-man on. Sigman continued to walk toward Officer Riddle, holding his knife in a threatening manner. By this time, Officers Terry, Brooks, Riddle, and Snyder had drawn their guns. As Sigman continued to approach and was 10 to 15 feet away from Officer Riddle, Riddle shot Sigman twice in rapid succession, mortally wounding him. Officer Riddle states that, at the time of the shooting, he believed that Sigman presented a danger to his life and safety and to the life and safety of others.
Officers Riddle and McKerlie approached Sigman, who was now lying on the ground on his back. On the ground near Sigman’s hand was the chefs knife with a broken tip, which Officer McKerlie kicked away from Sigman’s reach. The officers found that Sigman had been hit by one bullet in his abdomen and was now unconscious and having trouble breathing. They administered first aid to Sigman until an emergency medical team arrived. Sigman died in the hospital six hours later.
According to the officers, the Chapel Hill police department trains them in dealing with persons armed with knives. As Officer Snyder stated, “We are trained — twenty-one feet is the closest you let some-one get with an edged weapon because they can cut you or kill you before you can even fire.” This policy is confirmed by a police expert, who stated that the 21-feet standard “is based on studies which have shown that an armed individual within twenty-one feet of an officer still has time to get to the officer and stab and fatally wound the officer even if the officer has his weapon brandished and is prepared to or has fired a shot.”
Two years after Sigman’s death, Sigman’s parents filed this action, in two counts, on behalf of themselves and as administrators of Sigman’s estate, naming as defendants Officer Riddle, the town of Chapel Hill, its police department, and its police chief. The first count, brought under 42 U.S.C. § 1983, alleged violations of Sigman’s Fourth, Eighth, and Fourteenth Amendment rights based on the claim that Officer Riddle acted unreasonably when he shot Sigman while he was about 15 feet away. It also alleged that the police chief and police department trained Officer Riddle in a way that deprived Sigman of his constitutional rights. The second count, brought under North Carolina General Statute § 28A-18-2, alleged wrongful death based on the claim that the defendants breached their duty to exercise due care in dealing with Sigman. The plaintiffs demanded both compensatory and punitive damages.
The defendants filed a motion for summary judgment, contending that the officers are protected from liability in their individual capacity by qualified immunity, that the officers did not use unreasonable force, and that unreasonable force was not a custom or practice of the police department. Among the materials submitted, the defendants included affidavits of two police experts who, after reviewing the record, asserted that Officer .Riddle did exactly what a reasonable police officer would have done in similar circumstances and what police officers are trained to do in those circumstances.
In response to the defendants’ motion for summary judgment and over three-and-a-half *786 years after Sigman’s death, the plaintiffs’ lawyer located three witnesses, Keeia Roberson, Tejuana Roberson, and Charlotte Davis, who were among the cheering crowd across the street from Sigman’s duplex on May 22, 1993. Each of these witnesses signed an affidavit in identical form, on the same date, and with the same error that they observed the incident on May 23, a day after the incident. In their affidavits they stated that pursuant to the police officers’ numerous commands, “Sigman came out of the house, with his hands raised”; that they “could clearly see Mark Sigman’s hands and that he had nothing in them”; that Sigman was intoxicated; that the officers shot Sigman three steps from the front door; and that based on their observations, “Mark Sigman represented no threat of any kind to officer and that the officer shot him for no reason.”
In granting the defendants’ motion for summary judgment, the district court stated that the affidavits of Roberson, Roberson, and Davis were not sufficient to create a material issue of fact. The court observed that, “at best,” the affidavits created “a difference of opinion as to what the three witnesses observed ... and what Riddle observed and did in reaction to the conduct of Sigman.” The court held that nothing contradicted the fact that a reasonable officer would have perceived Sigman as a dangerous threat. It therefore concluded that Sigman’s constitutional rights were not violated. The court also held that, because Officer Riddle’s actions were objectively reasonable as a matter of law, the plaintiffs’ state law claims also failed.
This appeal followed.
II
Sigman’s parents contend that the affidavits of the three witnesses, Roberson, Roberson, and Davis, create a genuine issue of material fact and therefore that the district court erred in granting the defendants’ motion for summary judgment. They argue that the affidavits create factual disputes as to whether Sigman had a knife when he was shot, as to whether Officer Riddle’s perception that Sigman had'a knife was reasonable, and as to whether Sigman was a threat to the officers when he was shot. They also contend that the town of Chapel Hill, the police department, and the police chief should be subject to liability because they improperly trained their officers to shoot when an armed person comes within 21 feet of them.
We address first the question of whether Sigman’s parents created a factual dispute with respect to the issue of qualified immunity-
Police officers are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach “clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because qualified immunity is an immunity from suit, and not merely a defense to liability, courts must scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation. See Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Indeed, when a district court declines to give a qualified immunity defense a hard look at an early stage in the litigation, either pursuant to a Rule 12(b)(6) motion to dismiss or a summary judgment motion, it risks the forfeiture of some of the protections afforded by the defense because the immunity includes “an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question.” Behrens v. Pelletier, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting Mitchell, 472 U.S. at 526, 105 S.Ct. 2806); see also Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir.1996) (“One of the purposes of immunity ... is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit”) (quoting Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)).
In the case where a plaintiff alleges that a police officer has unconstitutionally used deadly force, the officer’s actions are judged on a standard of objective reasonable *787 ness. See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). And in determining objective reasonableness, the court must consider what a “reasonable officer on the scene” would have done, taking into account such factors as “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. at 396, 109 S.Ct. 1865. This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair. Thus,
[t]he “reasonableness” of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.
Id. at 396-97, 109 S.Ct. 1865.
On the record before us, it is undisputed that, at the moment that Sigman stepped out of the house, Officer Riddle had ample knowledge of Sigman’s dangerousness. Riddle knew that Sigman had a knife and was enraged inside the house, cutting himself. He knew that Sigman had been drinking and throwing things. He knew that Sig-man was willing to use his knife on others because Sigman had slashed at him through the window. He knew that Sigman had made threats on his life, on his fellow officers’ lives, and on Donna Solomon’s life. And he knew that Sigman had not previously responded to his requests to calm down or come out of the house. Furthermore, when Sigman emerged from the house, he did not obey the officers’ commands. Rather, he took a number of steps towards Officer Riddle. Riddle, and all of the officers at the scene, perceived that Sigman was holding a knife as he moved forward towards Officer Riddle, and the crowd behind Riddle was “taunting [Sigman] to continue.” It is undisputed that the atmosphere was volatile and threatening. These circumstances are exactly the kind that a qualified immunity analysis requires us to consider. See Graham, 490 U.S. at 396-97, 109 S.Ct. 1865; Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996) (“The court’s focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection”). Faced with this tense and dangerous situation, we conclude that Officer Riddle reasonably perceived a threat to his safety and the safety of others and that his response therefore was objectively justified and reasonable.
The plaintiffs argue that the affidavits of the Robersons and of Davis create a material issue of fact as to whether Officer Riddle reasonably perceived that Sigman had a knife. But “[i]t will nearly always be the case that witnesses ... differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon there ports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced.” Gooden v. Howard County, 954 F.2d 960, 965 (4th Cir.1992) (en banc) (emphasis added). The three witnesses in this case were located across the street amidst a crowd cheering Sigman on, as if the confrontation were a game or contest.*
*788 Their observations cannot effectively impact the credibility of Officer Riddle’s testimony (or that of all five other officers on the scene) as to his perceptions of what he saw from an entirely different — and closer — vantage point, especially when Officer Riddle had special knowledge of Sigman’s dangerousness and of the threats that Sigman had made on his life.
Furthermore, even if the affidavits can be considered for what Officer Riddle perceived and thereby cast doubt on whether Riddle saw something that was not there, a police officer need not, in all circumstances, “actually detect the presence of an object in a suspect’s hands before firing on him.” McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir.1994). The affidavits do not dispute the fact that a large knife was recovered from the ground near Sigman after he was felled by shots. Notwithstanding the possibility of a dispute about whether a knife was" actually in Sigman’s hand at the moment of the shooting, Officer Riddle, and the other officers present, acted on the perception that Sigman had a knife in his hand. Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently — and potentially still is — armed, and who is coming towards the officer despite officers’ commands to halt, we conclude that the officer’s decision to fire is not unreasonable. Accordingly, we reject the argument that a factual dispute about whether Sigman still had his knife at the moment of shooting is material to the question of whether Officer Riddle is entitled to the protections of qualified immunity in the particular circumstances of this case.
Because we conclude that Officer Riddle’s actions were reasonable, we need not address in any great length the plaintiffs’ federal claims against the police department, the chief of police, and the town of Chapel Hill because “[i]n the absence of any underlying use of excessive force ..., liability cannot be placed on either the non-shooting officers, a supervisor, or the City.” Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir.1996). We do note, however, that municipal liability can only ensue when an injury is caused by the execution of a municipal policy or custom when that policy or custom is a result of “policy maker fault of at least the degree of deliberate indifference to or reckless disregard for the constitutional rights of persons within police force jurisdiction.” Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir.1987). The only municipal policy that the plaintiffs have identified is the department’s training rule that an officer may use deadly force to stop a threatening individual armed with an edged weapon when that individual comes within 21 feet. As the basis for this rule, the department identified studies which have shown that an assailant with an edged weapon within 21 feet of an armed police officer can kill the officer before the officer can get off a disabling shot.
Sigman’s' parents argue that this policy amounts to “deliberate indifference” and that it makes a constitutional violation “almost bound to happen.” See Spell, 824 F.2d at 1390. There are two reasons why these arguments fail, however. First, the plaintiffs have not produced a shred of evidence that the policy is unreasonable. They have not called an expert, adduced any testimony, or in any way contested or brought into dispute the department’s reasons for the policy. Without such evidence, no factual dispute is created. And second, the plaintiffs’ whole case rests on the proposition that Sigman was not armed with an edged weapon. If he was not so armed, then this policy had no relevance to Sigman’s death.
Because we conclude that Officer Riddle’s actions were reasonable, it follows that the other defendants cannot be liable under the federal causes of action. Therefore we need not reach the defendants’ other asserted federal defenses.
Ill
The plaintiffs contend finally that the defendants should be subject to a state *789 law wrongful death action. They argue that the defendants waived their immunity under North Carolina law by taking out insurance and that Officer Riddle’s actions were at least negligent, creating liability for both the officer and the town of Chapel Hill. However, because we have concluded that Officer Riddle’s actions were, as a matter of law, reasonable in the circumstances of this ease, they cannot be negligent or wrongful, as required by N.C. Gen.Stat. § 28A-18-2(a).
Because the plaintiffs have no state law claim, we need not reach the issue of whether state governmental immunity was waived.

AFFIRMED.

The record shows that the incident occurred in front of the house after Sigman came out of the front door. The officers secured the streets, blocking traffic and moving the crowd across the street, which was observing from a rise across the street, probably more than 50 feet away. The house was over 30 feet from the curb. J.A. 346 T. Because the sides of the house and the streets around it were secured, any observer would have been from among the crowd across the street. J.A. 163, 169, 195, 237, 269, 295. Indeed, all three of the witnesses claimed to observe from across the street, stating, "I was living in Pritch-ard Park across from Mark Sigman when I witnessed police arrive,” etc. It was this crowd that cheered Sigman on. As Officer Snyder testified:
Q. Did it appear to you that the crowd of onlookers was somehow encouraging him in advancing when he was doing that— towards Riddle?
A. Yes, sir. Yes, sir. They were screaming and yelling. They had all crowded up on top of the hill at Pritchard Park and were *788 screaming and yelling, you know. I remember feeling that they were taunting him to continue instead of to give up.
J.A. 305.