**Janis LITTLE, Individually and as Administratrix of the Estate of Malachiah McQueen, Deceased, Plaintiff,**

v.

**Mike SMITH, David Morton, and Tony Martino, each individually and in his official capacity as a Deputy Sheriff; James N. Sellers, individually and in his official capacity as Sheriff of Anson County; Fidelity and Deposit Company of Maryland, as surety of the Sheriff's bond; and Anson County, Defendants.**

No. 3:99CV37–H.

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 17, 2000.

James E. Ferguson, Ferguson, Stein, Wallas, Gresham & Sumter, P.A., Charlotte, NC, for Janis Little, Individually and as administratrix of the Estate of Malachian McQueen, deceased, plaintiff.

Tyrus V. Dahl, Jr., Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, for Mike Smith, David Morton, Tony Martino, James N. Sellers, Fidelity and Deposit Company of Maryland, Anson County, defendants

### MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on the "Defendants' Motion for Summary Judgment" (document # 21) and "Brief in Support ..."(document # 22), both filed July 17, 2000; and "Plaintiff's Brief in Opposition ..." (document # 24), filed August 7, 2000. On August 16, 2000, the Defendant filed a "Notice of No Reply Brief" (document # 26).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for the Court's determination.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will *grant* the Defendants' motion and *dismiss* the Complaint.

### I. PROCEDURAL AND FACTUAL BACKGROUND

At all times relevant to this action, Defendant James Sellers ("Sheriff Sellers") was the duly elected Sheriff of Anson County, North Carolina; Defendants Mike Smith, David Morton, and Tony Martino ("the deputies") served as Deputies in the Anson County Sheriff's Office; and Defendant Fidelity and Deposit Company of Maryland ("Fidelity") was the surety on Sheriff Sellers' bond.[1]

On the afternoon of January 3, 1997, the Plaintiff, Ms. Janis Little ("Ms.Little"), and her brother, Mr. Malachiah McQueen ("decedent" or "Mr. McQueen") had an argument at the home they shared. During this episode, Mr. McQueen shook a stick at Ms. Little and spoke to her in a threatening manner. Thereafter, Ms. Little, her son Terence Little, and Ms. Little's boyfriend, James Deese, went to the Magistrate's office at the Anson County Courthouse in Wadesboro, North Carolina. Ms. Little explained what had happened and indicated that her brother had some mental problems. The Magistrate contacted a local mental health official who agreed to evaluate Mr. McQueen if he was "acting bizarre when the sheriff's deputies have him." Ms. Little then swore out a warrant for her brother's arrest for communicating threats based upon the earlier incident with the stick.

The warrant was delivered to the Anson County Sheriff's Office for service. Ms. Little spoke with two of the defendants, Captain Mike Smith and Sergeant David Morton, and explained to them that her brother was a paranoid schizophrenic; that their mother had been diagnosed with the same mental illness; and that Mr McQueen did not have a weapon. Because he was in uniform, it was planned that Sgt. Morton would actually serve the warrant, but Capt. Smith decided to accompany the sergeant in case there was a need for backup. The two deputies followed Ms. Little in separate patrol vehicles to the residence. The deputies pulled into the driveway while Ms. Little, her son, and Mr. Deese parked along the roadway. Ms. Little and Mr. Deese remained in the car throughout the incident, but Terence Little got out during the officers' confrontation with Mr. McQueen inside the house.

The deputies knocked on the door and were invited in by Mr. McQueen. They

---

**1.** N.C.Gen.Stat. § 162–8 requires a Sheriff to furnish a bond payable to the State of North Carolina. A person injured by the "neglect, misconduct, or misbehavior" of the Sheriff may bring a cause of action against both the sheriff and the surety. *State ex rel. Williams v. Adams*, 288 N.C. 501, 503, 219 S.E.2d 198, 200 (1975).

explained that they had a warrant for his arrest and that he would have to go with them. Mr. McQueen refused, stating, "[i]f I go with you in that car, police car out there, we are going to go up in the sky." Subsequently, there was a violent physical altercation between Mr. McQueen and the deputies in which Sgt. Morton sustained head injuries and the deputies were forced to retreat into the yard. Capt. Smith immediately called for backup assistance and they took up positions near their patrol cars.

Ms. Little alleges that Sgt. Morton then walked over to Ms. Little's car with a gun in his hand and told her that he might have to shoot Mr. McQueen; that she restated her contention that her brother was mentally ill and unarmed; that she asked Sgt. Morton if there was another approach they might take; and that Sgt Morton responded that just because he was wearing a uniform did not mean he was "Superman."

Officers from a number of different law enforcement agencies, including the North Carolina Highway Patrol, responded to Capt. Smith's call for backup. As the additional officers arrived, Capt. Smith got on the public address system of his patrol car and announced to Mr. McQueen that he had five minutes to come out. Officers fanned out around the house while North Carolina Highway Patrolman Landric Reid retrieved his rifle and Deputy Tony Martino secured his shotgun, from their respective trunks. Capt. Smith again announced over the PA system that Mr. McQueen had five minutes to come out.

It was becoming dark and there was little light, except from the light in the carport. As the officers watched, Mr. McQueen came out through a side door, crossed the carport area, and began walking up a path beside and behind the house. Capt. Smith, Sgt. Morton, Deputy Martino, and Trooper Reid followed while issuing lawful commands for the suspect to stop and show his hands. As they pursued Mr. McQueen, Sgt. Morton used his flashlight in on-off bursts to illuminate Mr. McQueen but none of the officers were able to see his hands. They continued to order Mr. McQueen to stop and put his hands in view, but he simply ignored them and continued on along the path toward the woods. Sgt. Morton attempted to disable the suspect through the use of OC pepper spray, but it appeared to have no effect on Mr. McQueen.

As Mr. McQueen continued toward the woods behind the house, he suddenly wheeled about, extended his right arm toward the officers in a threatening manner, appearing to have a gun in his right hand. Sgt. Morton saw a black object in Mr. McQueen's hands and pointed at him in "a two-handed gun position," which Trooper Reid believed to be a "shooting stance." Capt. Smith fired two shots without any apparent effect as the officers ducked or dived for cover. Trooper Reid later testified that at that point, although he did not fire, he would have shot the suspect except that a clear shot was prevented by the presence of Sgt. Morton who was also coming back to his feet. Trooper Reid also testified that, as he heard the two shots being fired, Mr. McQueen's right hand appeared to bounce upward as if in response to the recoil of a handgun. The officers were convinced that Mr. McQueen was armed with a handgun at that time. Mr. McQueen turned and continued to walk up the path for a short distance despite additional commands that he stop and show his hands. Suddenly, Mr. McQueen repeated the move in which he turned abruptly toward the officers with his arm extended and a cylinder-like object protruding from his hand. At that point, Capt. Smith, Sgt. Morton and Deputy Martino all fired. Trooper Reid did not fire because he had lost sight of the suspect.

Mr. McQueen fell forward on his stomach with both of his hands covered by his body. The officers, not knowing the extent of any injuries to Mr. McQueen, again ordered him to show his hands, but then pulled his hands from under his body. In

his right hand Mr. McQueen held a small dumbbell and in his left, a pipe and a glass vile. The ambulance, which had been "staged" nearby following the original emergency calls for backup, was summoned and arrived within minutes. Mr. McQueen subsequently died as a result of the gunshot wounds. The single buckshot round from Deputy Martino's shotgun proved to be the fatal shot.

On December 30, 1998, the Plaintiff, after qualifying as personal representative of the decedent's estate, filed a complaint in Anson County Superior Court alleging a claim under 42 U.S.C. § 1983 for excessive force, a state constitutional claim, and state law claims for wrongful death and intentional infliction of emotional distress. On February 1, 2000, the Defendants removed the state action to federal court alleging federal question jurisdiction, which appears proper and has not been challenged by the Plaintiff.

During his deposition, the *Plaintiff*'s expert witness, Dr. George Kirkham of Lake Worth, Florida, a well-known criminologist, described his understanding of the facts of the case in some detail, consistent with the facts as stated above. Although he opined that the deputies made numerous mistakes during events leading up to the shooting, on cross-examination, Dr. Kirkham testified as follows:

Q. You have outlined in great detail a lot of events leading up to Mr. McQueen spinning and pointing at the officers with what appeared to be something in his hand, which the officers perceived to be a weapon. *But at the moment that the officers perceived a weapon in the hand of Mr. McQueen the first time, was there anything unreasonable, in your expert opinion, about their response?*

A. You mean specifically the discharge of firearms?

Q. Yes, sir.

A. *Not in that circumstance.*

Q. *Then in the second circumstance where Mr. McQueen turns suddenly and the officers perceive that there was a weapon, do you see anything unreasonable about their response?*

A. Weapon being defined in their testimony as what they believe is a gun?

Q. Yes.

A. *No....*

Q. All right, I want to discuss those two episodes one at a time, if we could, where the officers have testified that *Mr. McQueen, walking away from them, suddenly turns with his arm thrust toward them and one or more of the officers observes an object in his hand. At that moment do you see anything wrong with responding with lethal force?*

A. *No.*

Q. All right. Moving to the second episode. So far as we know, the first two shots from Captain Smith missed; is that your understanding?

A. That's my understanding.

Q. Before we get to the time Mr. McQueen turns again, after those two shots are fired and Mr. McQueen resumes walking away, is it appropriate that the officers ceased firing?

A. Oh, yeah.

Q. Okay. *At the very point at which Mr. McQueen turns a second time, again with his arm outstretched and one or more of the officers perceiving a weapon to be in his hand, is it appropriate to use lethal force at that point?*

A. Just a question, a clarifying question. Are we setting aside the impropriety that I have alluded to of continuing to follow him after the first two shots?

Q. No, you testified to that.

A. All right. *So playing it where the ball lies then, where he's now turned a second time, that's a recap of the first situation, essentially, and that's also a shoot situation.*

Q. So you don't see anything wrong or unreasonable about the officers at the moment responding with lethal force?

A. No.

(emphasis added). Dr.Kirkham elaborated that "if he—they say [the evidence is uncontroverted] he turns toward them with what they think is a gun. Well, that's obviously a shoot situation, there is no question about that. *If somebody turns and makes any movement at all toward you with what you think is a gun, you shoot them.*" (emphasis added).

On July 17, 2000, all of the Defendants moved for summary judgment. As noted above, this motion is now ripe determination.

## II. *DISCUSSION OF CLAIMS*

### A. *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted only when the pleadings, responses to discovery, and the record reveal that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 974 (4th Cir.1990); *Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249–50, 106 S.Ct. 2505.

When considering summary judgment motions, courts must view the undisputed facts and the inferences to be drawn therefrom in the light most favorable to the party opposing the motion. *Id.* at 255, 106 S.Ct. 2505. *Accord Matsushita Electric Indust. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990); *and Cole v. Cole,* 633 F.2d 1083 (4th Cir.1980). In other words, summary judgment is appropriate only "when it is clear that there is no dispute concerning either the [material] facts of the controversy or the inferences to be drawn from those facts." *Wall v. A.T. & T. Tech., Inc.,* 754 F.Supp. 1084, 1089 (M.D.N.C.1990), *quoting Pulliam Invest. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

### B. *Section 1983 Claim for Excessive Force and Qualified Immunity of Defendant Deputies*

Title 42 U.S.C. § 1983 provides, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. ...

42 U.S.C. § 1983.

"The first inquiry in any § 1983 suit is to isolate the precise constitutional violation with which [the defendants are] charged." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *See also Tennessee v. Garner,* 471 U.S. 1, 7–22, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *and Austin v. Paramount Parks, Incorporated* 195 F.3d 715, 727 (4th Cir. 1999). Where, as here, an excessive force claim is alleged in the context of an attempted arrest, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures." Therefore, "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest ... of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. ..." *Graham,* 490 U.S. at 394–95, 109 S.Ct. 1865.

In determining objective reasonableness, the Supreme Court has instructed:

[The district court] must consider what a reasonable officer on the scene would have done, taking into account such factors as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.... Thus, the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. 1865. *Accord Sigman v. Town of Chapel Hill,* 161 F.3d 782, 786–87 (4th Cir.1998) ("Evaluation [of excessive force] is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair.")

■■■ Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See also Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir.1998) (en banc), *aff'd,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992).

In cases of alleged excessive force, the Fourth Circuit evaluates a defendant officer's defense of qualified immunity under the *Graham* "reasonableness" standard. Most recently, in *Sigman v. Town of Chapel Hill, supra,* the Fourth Circuit explained:

Police officers are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach "clearly established statutory or constitutional rights of which a reasonable person would have known...." [Q]ualified immunity is an immunity from suit, and not merely a defense to liability.... In the case where a plaintiff alleges that a police officer has unconstitutionally used deadly force, the officer's actions are judged on a standard of objective reasonableness.... The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* 161 F.3d at 786–87 (internal citations omitted). *Accord Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.1996) ("The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection"); *and Pittman v. Nelms,* 87 F.3d 116, 119 (4th Cir.1996) ("One of the purposes of immunity ... is to spare a defendant not only unwarranted liability, but unwarranted demands cus-

tomarily imposed upon those defending a long drawn out lawsuit").

■ Further, it is well established that a law enforcement officer "may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or to others." *Elliott,* 99 F.3d at 642, *citing Tennessee v. Garner,* 471 U.S. at 11, 105 S.Ct. 1694. *Accord Pittman,* 87 F.3d at 120; *McLenagan v. Karnes,* 27 F.3d 1002, 1007 (4th Cir.1994); *Drewitt v. Pratt,* 999 F.2d 774, 777 (4th Cir.1993); *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991); *and Greenidge v. Ruffin,* 927 F.2d 789, 791 (4th Cir.1991).

■ Nor is the fact that Mr. McQueen was later determined not to have had a gun determinative of the reasonableness of an officer's decision to use deadly force. In *Slattery, supra,* an officer (Rizzo), in a narcotics arrest, sought to take custody of a passenger in a suspect's car. Rizzo drew his revolver after Slattery ignored repeated commands to place his hands in view, as the decedent did in this case. Although Rizzo could not see Slattery's left hand, he could tell that it was partially closed around an object. In response to yet another order by the officer to the suspect to raise his hands, Slattery turned his entire upper body toward Rizzo. Believing that Slattery was coming at him with a weapon, Rizzo fired. The object in Slattery's hand was later found to be a beer bottle. The Fourth Circuit upheld Rizzo's use of force even though he did not actually see a weapon and even though it was not certain that the movement was the beginning of an attack on Rizzo. 939 F.2d at 216. *Accord Sigman,* 161 F.3d at 788 ("[W]e reject the argument that a factual dispute about whether Sigman still had his knife at the moment of shooting is material to the question of whether Officer Riddle is entitled to the protections of qualified immunity").

The thrust of Plaintiff's argument to overcome the deputies' qualified immunity is that the deputies made earlier mistakes that caused the situation to become dan-gerous. Indeed, as noted above, Plaintiff's own expert finds no fault with the shooting itself but rather states that, while McQueen was still alone inside the house, the officers made numerous mistakes, for example, failing to have a member of McQueen's family talk to him over a bullhorn. Further, Dr. Kirkham found fault with the deputies' continued pursuit of McQueen into the woods and their attempt to subdue him with pepper spray. These arguments are to no avail as the Fourth Circuit has clearly stated that "[t]he court's focus should be on the circumstances *at the moment force was used* and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Greenidge,* 927 F.2d at 791–92, *citing Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865 (finding qualified immunity in spite of mistakes in procedure leading up to shooting, including failure to use a flashlight). *Accord Elliott,* 99 F.3d at 642 (finding qualified immunity even though moments prior to the shooting the decedent had been frisked and seat-belted in the front seat of a police car, with his hands handcuffed behind his back); *and Drewitt,* 999 F.2d at 777–78 (finding qualified immunity in spite of mistakes in conducting traffic stop).

Even when taking the evidence in the light most favorable to the Plaintiff, as we must, at the moment McQueen stepped out of the house and began to walk through the backyard, it is clear that the deputies had ample knowledge of his potential dangerousness. The deputies knew that McQueen had earlier threatened his sister with a stick and had violently resisted deputies when they entered his house and tried to take him into custody. Moreover, McQueen repeatedly ignored officers' commands—both to stop and to show his hands. Rather, he twice turned towards the officers with an object in his right hand and assumed what appeared to be a "shooting stance." It is undisputed that the atmosphere was volatile and threatening and, although it is not necessary to a qualified immunity defense to prove that

there was, in fact, an object in McQueen's hands, *see McLenagan,* 27 F.3d at 1007, it is undisputed that a dumbbell was found in McQueen's hand where he fell. These circumstances are exactly the kind that a qualified immunity analysis requires the Court to consider. *See e.g., Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865; *and Elliott,* 99 F.3d at 642.

In short, the undersigned concludes that, faced with this tense and dangerous situation, Deputies Smith, Morton, and Martino reasonably perceived a threat to their safety and the safety of others and that, as the Plaintiff's own expert agrees, their response was objectively justified and reasonable. *Accord Tennessee v. Garner,* 471 U.S. at 11, 105 S.Ct. 1694; *Sigman,* 161 F.3d at 787–88; *Elliott,* 99 F.3d at 642; *Pittman,* 87 F.3d at 120; *McLenagan,* 27 F.3d at 1007; *Drewitt,* 999 F.2d at 777; *Gooden v. Howard County,* 954 F.2d 960, 965 (4th Cir.1992) (en banc); *Slattery,* 939 F.2d at 216; *and Greenidge,* 927 F.2d at 791. Therefore, the deputies are entitled to qualified immunity and their motion for summary judgment must be granted.

### C. *Claims Based on State Constitution and Common Law*

■ Since the North Carolina Constitution is co-extensive with the Constitution of the United States on the issue of excessive force, the state constitutional claim must fail for precisely the same reasons. *See McNeill v. Harnett County,* 327 N.C. 552, 563, 398 S.E.2d 475, 481 (1990) (the "law of the land" clause of the North Carolina Constitution is synonymous with the due process clause of the Federal Constitution); *and S.S. Kresge Co. v. Davis,* 277 N.C. 654, 178 S.E.2d 382 (1971) (same for equal protection). *Accord Sigman,* 161 F.3d at 788–89 (granting summary judgment as to wrongful death claim based on defendants' alleged "negligence").

### D. *Claims Based on Policy, Training, and Supervision*

■ The Plaintiff alleges liability on behalf of Sheriff Sellers and Anson County indirectly—only on theories of improper training, supervision, or procedures; and against Fidelity only as surety of Sheriff Sellers' sheriff's bond. As the Fourth Circuit recently stated:

> Because we conclude that [the officer's] actions were reasonable, we need not address in any great length the plaintiffs' federal claims against the police department, the chief of police, and the town of Chapel Hill because in the absence of any underlying use of excessive force ..., liability cannot be placed on either the non-shooting officers, a supervisor, or the [government entity].

*Sigman,* 161 F.3d at 788 (internal citations omitted). *Accord City of Canton, Ohio v. Harris,* 489 U.S. 378, 379, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (in absence of underlying constitutional violation, no liability for deficient training program); *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (no respondeat superior or vicarious liability under § 1983 absent an underlying constitutional violation); *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("[none] of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm"); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (in absence of underlying constitutional violation, no liability for deficient agency policy or custom); *Hinkle v. City of Clarksburg,* 81 F.3d 416, 420 (4th Cir. 1996); *and Giancola v. State of West Virginia Dept. of Pub. Safety,* 830 F.2d 547, 550 (4th Cir.1987) ("If the officers' actions were in compliance with constitutional standards, there is no liability on the part of ... the employing entities"). Therefore, where as here, the deputies' actions were reasonable and protected under the doctrine of qualified immunity, Sheriff Sellers, his surety, and Anson County can have no liability.

Further, in regard to Anson County, the key inquiry is how state law allocates power and responsibility. *McMillian v. Monroe County,* 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Dotson v. Chester,* 937 F.2d 920, 924 (4th Cir.1991). A county may only be held liable for acts for which the county has final policymaking authority. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Whether a county or county official has final policymaking authority in a specific area is a question of state law. *Id.*

In North Carolina, the Office of Sheriff is a legal entity, established by the state constitution and state statutes, separate and distinct from the Board of County Commissioners because a sheriff is elected by the people, not employed by the county. *See* N.C.Gen.Stat. § 162–1 (2000). The sheriff, not the county, has final policymaking authority over the personnel decisions in his office. *Clark v. Burke County,* 117 N.C.App. 85, 89, 450 S.E.2d 747, 749 (1994) ("any injury resulting from [the deputy sheriff's] actions in this case cannot result in liability for Burke County and summary judgment is therefore affirmed for Burke County"). N.C.Gen.Stat. § 153A–103 provides that each elected sheriff "has the exclusive right to hire, discharge, and supervise the employees in his office." This authority may not be delegated to another person or entity. N.C.Gen.Stat. § 162–24 (2000).

Thus, it is Sheriff Sellers, not Anson County, who has the final decision making authority over law enforcement policies of his office. Indeed, Anson County does not have the power to exercise supervision or control over the law enforcement officers who work for the sheriff who "are appointed by and act for the sheriff, who alone is responsible for their conduct." *Styers v. Forsyth County,* 212 N.C. 558, 561, 194 S.E. 305, 309 (1937). *Accord Peele v. Provident Mut. Life Ins. Co.,* 90 N.C.App. 447, 449, 368 S.E.2d 892, 894 (1988).

In short, Anson County has no authority to control law enforcement policies of the Anson County Sheriff's Office or to control its personnel. Therefore, for this additional reason, Anson County's motion for summary judgment will also be granted.

### III. *ORDER*

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. "Defendants' Motion for Summary Judgment" (document # 21) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.